MERIWETHER, Respondent, v. PUBLISHERS: GEORGE KNAPP AND COMPANY, Appellant.

St. Louis Court of Appeals, June 5, 1906.

1. **SLANDER AND LIBEL:** Evidence: Previous Publication. In an action for libel where the petition alleged that the defendant by its publications first blackened the character of a certain politician, denouncing him as a criminal, etc., and then in another libelous article characterized the plaintiff as a co-worker with the politician, classing him as being on the same moral plane, the previous publications relating to the said politician were necessary evidence to make out the plaintiff's case and properly admitted.

2. ———: ———: ———: Jury Question. And in such case it was not necessary to allege or prove that the politician denounced as corrupt, with whom the plaintiff was charged with affiliating, was in fact corrupt; it was a question for the jury to determine whether the plaintiff was slandered by being classed as a co-worker with the person denounced by the libeler as corrupt.

3. ———: Justification: Falsus in uno, falsus in omnibus. Where plaintiff alleged that the defendant had libelously, in its newspaper, charged him with political corruption and conspiring with a corrupt politician, and that plaintiff wrote a letter to the defendant explaining the incident out of which the libelous

charge arose and this letter the defendant denounced in its pub-
lication as a collection of untruths, reiterating its charge of
political corruption and trickery, the fact that the letter con-
tained a false statement concerning the Supreme Court would
not amount to a justification of the defendant's publication, on
the theory of "*falsus in uno, falsus in omnibus*," because the
false statement in the letter denounced by the defendant did not
apply to the principal matter under discussion; it was a ques-
tion for the jury whether the letter or the libel spoke the truth
in regard to the matters in controversy.

4. ———: ———: **Charge Partly True.** In an action for libel, the
defense of justification for the publication of the matter charged
as libelous is not sustained by proving that part only of the
same was true.

5. ———: **Measure of Damages: Libel Partly True.** Where the
plaintiff, in an action for libel, had been charged with being
a liar, a trickster and an ally of a corrupt politician, an instruc-
tion on the measure of damages in case of verdict for the plain-
tiff, which did not separate the several charges, or limit the
verdict to such damages as accrued on the part that was true,
was not erroneous; the jury could not have misunderstood that
the damages they awarded was compensation for so much of
the publication as they found to be both false and libelous.

6. ———: **Practice: Verdict: Punitive Damages.** Where plaintiff,
in an action for libel, sued for $5,000 actual and $5,000 punitive
damages and the court submitted two forms of verdict in favor
of plaintiff, one providing for actual damages alone, and the
other providing for both actual and punitive damages, and the
jury returned a verdict in the sum of $5,000 actual damages,
the verdict was not open to the objection that the jury may.
have included punitive damages in it.

7. ———: ———: **Instruction.** In an action for slander, where the
defendant had charged the plaintiff, in a libelous publication,
with political corruption, an instruction offered by defendant
telling the jury if they believed that the plaintiff received finan-
cial contributions in aid of his campaign from the representa-
tives of another political party, who were supporting their own
candidates, which fact the plaintiff falsely reported in the state-
ment of his campaign expenses, the defendant had a right to
"characterize him as a trickster in politics," was properly
modified by the court by inserting in lieu of the words quoted
"criticize plaintiff therefor," where the plaintiff did not make
such false report, but it was done by his political committee.

8. ———: ———: ———. In an action for libel where the libel
charged plaintiff with political corruption and association with

a corrupt politician, an instruction which told the jury that the defendant had a right to criticize plaintiff as the associate and ally of the said corrupt politician, if they believed the association existed, was properly modified by the court so as to require a finding that such association continued and existed at the time of publication.

9. ———: ———: ———. And where there was evidence of a fusion agreement between the plaintiff's party and another political party and evidence tending to show that the agreement was corruptly made, instructions telling the jury as a matter of law that the fusion agreement was corrupt and opposed to public policy which the defendant had a right to criticize as such, were properly modified by the trial court, so as to require a finding that the defendant believed in good faith that the agreement was corrupt before it had a right to criticize it as such.

10. ———: **Damages: Excessive Verdict.** In an action for libel, where the libel charged the plaintiff with being a political trickster and associated with a corrupt politician and a liar, a verdict for $5,000 on a finding in his favor by the jury was not excessive.

11. **PRACTICE: New Trial: Tampering with the Jury.** In an action for libel, on a motion for new trial on the ground that plaintiff tampered with the jury, the evidence is examined and held insufficient to show any conversation with the jurors which could have influenced their verdict.

Appeal from Lincoln Circuit Court.— *Hon. James D. Barnett*, Judge.

AFFIRMED.

*R. H. Norton, O. H. Avery* and *Lehmann & Lehmann* for appellant.

(1) The court should have directed a verdict for defendant because the publication was true and not libelous, and because it was a fair reply to the libelous attacks of plaintiff. Fish v. Printing Co., 102 Mo. App. 6; Bigney v. Van Benthysen, 36 La. Ann. Rep. 38; Myers v. Kaichen, 75 Mich. 272; Shepherd v. Baer, 53 Atl. 790; 96 Md. 152; Chaffin v. Lynch, 83 Va. 106; 1 S. E. 803; Newell on Libel and Slander (Ed. 1898),

p. 515; sec. 114; Odgers on Libel and Slander (Ed. 1905), pp. 275, 276, and English cases there cited. Crane v. Waters, 10 Fed. Rep. 619; Hallam v. Pub. Co., 59 Fed. Rep. 530; Vance v. Courier-Journal, 95 Ky. 41; 23 S. W. 591; Jackson v. Times, 152 Pa. 406; 25 Atl. 613; O'Rourke v. Daily Sun, 89 Me. 310; 36 Atl. 398; Herringer v. Ingberg, 97 N. W. 460; Tappan v. Wilson, 7 Ohio Reports 190; Burt v. Newspaper, 154 Mass. 238, 28 N. E. 1. (2) Publications by defendant in criticism of plaintiff made prior to the publication sued upon were not admissible in evidence in this case. Christal v. Craig, 80 Mo. 367; McAtee v. Valandingham, 75 Mo. App. 45; Krup v. Corley, 95 Mo. App. 648. (3) Publications by defendant concerning Edward Butler were not admissible in evidence, there being no allegation in the petition that Butler was a corrupt man, or that he was believed to be so. Powell v. Crawford, 107 Mo. 601; Bundy v. Hart, 46 Mo. 464. (4) The letter addressed by plaintiff to the defendant was false, and the defendant had the right to so characterize it in general terms, and was not guilty of publishing a libel for doing so, instead of picking out the falsehoods specifically and branding them. Clothing Co. v. Dry Goods Co., 156 Mo. 405. (5) The instructions of the court authorized a recovery for damages for all injuries caused by the entire publication if any portion of it was found to be untrue and libelous. 18 Am. and Eng. Ency. of Law, 1070. (6) Evidence of other publications than the one sued upon having been admitted, the court by specific instruction should have limited the recovery of damages to such as were occasioned by the portions of the article in suit, if any, which were libelous. Grimes v. Thorp, 88 S. W. 638; Callahan v. Ingram, 122 Mo. 355. (7) The publication complained of related to a matter of privilege, and malice could not therefore be presumed as matter of law against the defendant, even though some portion of the article was untrue. Gattis

v. Kilgo, 38 S. C. 931, 128 N. C. 402; Sullivan v. Commission Co., 152 Mo. 277. (8) The court erred in refusing to give the eleventh instruction asked by defendant. The Carroll-Meriwether agreement was contrary to public morals, and the court should have so charged. Whether in its comments upon plaintiff respecting this agreement, the defendant was guilty of a libel did not depend upon its belief respecting the same. Outon v. Rhodes, 13 Am. Dec. 193; Graton v. Inhabitants, 26 Am. Dec. 530; Eddy v. Capron, 67 Am. Dec. 541; Bakett v. Moss, 115 N. C. 448; Sautleben v. Frosboese, 43 S. W. 571; Stout v. Ennis, 28 Kan. 706; Hager v. Catlin, 18 Hun 448; Doane v. Railway, 160 Ill. 22; Robertson v. Robinson, 65 Ala. 610. (9) The instructions of the court do not fairly submit the issue of justification, but authorize a verdict against the defendant if any portion of the publication independently considered is untrue, while the defendant was entitled to a verdict if the article, considered in its entirety, was substantially true. Constitution, art. 2, sec. 14; Ratcliffe v. Courier, 36 S. W. 177; Jackson v. Times, 25 Atl. 613; Edwards v. Knapp, 97 Mo. 432; Dry Goods Co. v. Clothing Co., 156 Mo. 393. (10) The verdict is excessive in amount. Davis v. Starrit, 97 Me. 568; Evening Post v. Rhea, 81 S. W. 273. (11) The jury should have been discharged because tampered with in plaintiff's behalf. Bradbury v. Coney, 62 Me. 225; Stafford v. Oskaloosa, 57 Ia. 748.

*Robert L. Sutton, Wm. A. Dudley* and *H. S. Julian* for respondent, *Lee Meriwether, pro se.*

(1) Defendant's claim of privilege on the ground that the publication complained of was a fair reply to the libelous attacks of plaintiff cannot be allowed, even if it be taken as proved that plaintiff libeled the Supreme Court; to constitute privilege it must be shown that plaintiff libeled the defendant; and even then defendant's publication will not be privileged if it makes any counter charge against plaintiff's character unconnected

with his original charge against defendant. 18 Am. &
Eng. Ency Law, p. 1010; Odgers on Libel and Slander,
p. 275; Fish v. Printing Co., 102 Mo. App. 6. (2) Pub-
lications by defendant in criticism of plaintiff made
prior to the publication sued on were admissible in
evidence in this case; anything defendant ever said or
did with reference to plaintiff may be urged as
evidence of malice. Odgers on Libel and Slander,
p. 208 (marginal p. 276-280); Hall v. Jennings, 87 Mo.
App. 627; 18 Am. Eng. Ency. Law, 1010, and cases cited;
Id., 490, 491; Newell on Def. Slander and Libel, pp.
334-337, 770; Odgers on Libel and Slander, pp. 271, 296;
State v. Wright, 141 Mo. 333; Moeninger v. Vogt, 88 Mo.
589, 593; Davis v. Vories, 141 Mo. 234; State v. Wilson,
143 Mo. 334.

STATEMENT.—Omitting caption, the petition is as
follows:

"Plaintiff says that defendant did on January 20,
1902, February 1, 1902, February 3, 1902, March 15,
1902, May 19, 1902, September 24, 1902, and on divers
other dates between January 1, 1902, and September
28, 1902, publish in its said newspaper, the St. Louis
Republic in its issues of said dates, numerous articles
strongly denunciatory of one Edward Butler, a prom-
inent St. Louis politician, whom it persistently and con-
tinuously held up to the public in said articles as a crim-
inal, a perverter of the young, a villain twice indicted by
the grand jury for attempted bribery, a criminal with-
out shame, so covered with moral slime as to contam-
inate any man associated with him. And having thus
persistently advertised the said Butler as the synonym
of all that is vile, dishonest, corrupt and criminal, de-
fendant did on February 17, 1902, September 25, 1902,
and on divers other dates in the year 1902, prior to Sept-
ember 27, 1902, publish in its said newspaper of said
dates articles declaring that plaintiff was a friend,
associate, co-worker and ally of said Butler, and that

plaintiff was working under the management of said
Butler. In order partly at least to undo the great
damage done to him by defendant's said publications,
coupling plaintiff with a man advertised by defendant
throughout the city of St. Louis and the State of Miss-
ouri as a man of vile and criminal character, plaintiff
sent defendant a letter setting forth the true facts and
showing the falsity of defendant's statement that plain-
tiff was working with the said Edward Butler. Plain-
tiff's letter (which the court's ruling heretofore made
on defendant's motion requires to be stated in this peti-
tion) was in words and figures as follows, to-wit:

"'St. Louis, Mo., September 25th.
"'Editor Republic:

"'Sir.—Your paper to-day states editorially, as well
as in its news columns, that Col. Edward Butler visited
me at my office yesterday in 'connection with a scheme
to split the Democracy.' It is true that Col. Butler call-
ed on me but the purpose of his call, so far from being
to split the Democracy, was, if possible, to induce me to
assent to a plan that would add to the Democratic
chances of success next November. Col. Butler stated
that he came direct from Mr. Rothwell, state chairman
of the Democratic party, and that he was commissioned
to inquire if some arrangement could not be effected
whereby the Democratic supreme judge nominees could
be placed on the Public Ownership ticket.

"'I informed Col. Butler that according to our view
the Democratic supreme court, in declaring the constitu-
tion itself unconstitutional, in order to nail up the
ballot boxes, and thus cover all evidence of the frauds
perpetrated at the last municipal election, had forfeited
the right to claim support from any true Democrat,
consequently that under no circumstances could I bring
myself to advocate the election of the supreme judge
nominees. Thereupon Col Butler went away, return-
ing again later with the statement that he had held an-

other conference with the Chairman Rothwell and also with Hon. J. M. Seibert, and this time he was commissioned to inquire if we would not at any rate agree not to place the Republican supreme judge nominees upon our ticket. Mr. Butler stated that while they would prefer us to put the Democratic Nominees on our ticket, if that could not be done, then the next best thing would be to have us place a straight Public Ownership ticket in the field and avoid placing on our ticket any one of the Republican nominees. He added that this would be worth a good deal to the Democratic party, and, if we consented to it, suitable "arrangements" would be made for us by the Democratic committee.

" 'I, of course, do not know of my own knowledge what was said by Messrs. Rothwell and Seibert, nor do I know that Col. Butler came from them. I do know, however, that he came for the purpose above stated, and that absolutely no other subject was discussed between us. You will see, therefore, that you are in error when you say that Col. Butler is trying to split the Democrats; on the contrary, he is doing all within his power to aid in the election of the Democratic ticket, and, no doubt, on November 4, will be found aiding that ticket, not only by his vote, but by those methods for which he is distinguished, and which were so effectively used to secure the election of Mr. Rolla Wells.

" 'LEE MERIWETHER.'

"Plaintiff requested defendant to publish said letter in its said newspaper but defendant refused and instead, on September 27, 1902, in its said newspaper of that date defendant did wilfully, falsely and maliciously seek to blacken and ruin plaintiff's reputation and character by publishing of and concerning plaintiff the following false, scandalous, defamatory and malicious language, to-wit:

" 'MERIWETHER AND HIS FRIENDS.

" 'Meriwether and his organs, the Star and Globe-Democrat, complained because the Republic would not

publish a certain letter concocted by the trickster.

" 'What the Republic did do was to publish Meriwether's version of his conferences with Butler, with something besides of the actual facts. Meriwether got in the Republic what he professed to desire. If he got more it was his own fault.

" 'Meriwether's letter was for the most part a series of untruths, forwarded to the Republic, not to correct an error but to deceive all readers.

" 'Being a collection chiefly of untruths, it was naturally seized upon by the Globe with delight.

" 'Butler and Meriwether are trying to trade around among all sorts of tickets. They inevitably come together in consultation as they pursue their games. As old allies in politics they know how to talk to each other.

" 'Both of them have been engaged this summer in making up Republican and Fusion tickets. The Globe and Star are their natural organs. For all purposes of practical politics, Butler and Meriwether are together and are Republicans of the kind dear to the Globe's and the Star's hearts,'

"meaning by said language to charge, and charging, that plaintiff was an old ally, friend, associate and co-worker of a notorious boodler, villain, bribe-giver and perverter of young men, and who was under two grand jury indictments for attempted bribery. And meaning further by said language to charge, and charging plaintiff with being a trickster, a deceiver, a cheat who lives by deception and fraud; and meaning further by said language to charge, and charging that plaintiff wrote and forwarded to the said St. Louis Republic a letter containing a series of untruths, meaning lies, and that he wrote said letter to deceive all readers, meaning and charging by said language that plaintiff was guilty of writing falsehoods for the purpose of deceiving, and that he is wanting in veracity, that he is a liar and unworthy of belief. And the said language was so understood by the public, and in consequence of its wide publication

the defendant in its said newspaper as aforesaid plaintiff has been greatly injured in his good name, fame and reputation and has suffered great mortification, humiliation and shame, and has been otherwise injured to his actual damage in the sum of five thousand ($5,000) dollars, for which sum, together with the costs of his action, he asks judgment.

"And by way of punitive or exemplary damages plaintiff asks the further sum of five thousand ($5,000) dollars."

The answer is as follows:

"1. The defendant for amended answer to the third and only count of plaintiff's amended petition, leave of court to file the same being had and obtained admits that it is and was at all the times mentioned in plaintiff's petition a corporation engaged in the publication of a daily newspaper called the 'St. Louis Republic.'

"Admits that on the twenty-seventh day of September, 1902, it caused to be printed and published in said paper of that date an editorial article entitled 'Meriwether and His Friends.'

Denies each and every other allegation in said amended petition contained.

"2. Answering further defendant says that at and for many years before the date of said publication, plaintiff was and had been a conspicuous figure in the public life of said city and State, had belonged to various political parties, had been an office holder and office seeker, had recently been the candidate of the Public Ownership party for the office of mayor of said city, and was at the time of said publication one of the active and recognized leaders and managers of said Public Ownership party in the State of Missouri, and that the publication aforesaid was made of and concerning plaintiff in his capacity of politician and public man.

"And this defendant avers that said publication

so made of and concerning the plaintiff as a politician and public man was true in substance and in fact, for that the plaintiff as a public man assumed to stand for higher and purer methods in politics and in public life and denounced the older existing political organizations, to-wit: The Republican and Democratic Parties as wholly unworthy of public confidence and denounced the Supreme Court of Missouri and other officials of the State as dishonest and corrupt and denounced this defendant as untruthful in its advocacy of Democratic principles and candidates and assumed and pretended that his, the plaintiff's purpose in politics was to purify and exalt the same when in truth and in fact such professions on his part were tricks and falsehoods resorted to for the purpose of serving his own ends.

"And defendant avers that it is a trick and a falsehood for plaintiff in this case to assert abhorrence that his name should be associated with that of Edward Butler, when in truth and in fact the said plaintiff had been repeatedly, to-wit: in the mayoralty campaigns of the city of St. Louis in the years 1897 and 1901 and in the State campaign of Missouri in 1902, associated with said Butler for the purpose of promoting the political fortunes of him the said plaintiff. And in 1897 it was agreed by and between the said plaintiff, the said Butler, Edward A. Noonan and Joseph Brown that they and their friends should work together to nominate the said plaintiff, and failing in this to nominate the said Noonan, and failing in this, to nominate the said Brown.

"And in the campaign of 1901, the said plaintiff to serve his own candidacy for the mayoralty of St. Louis sought with the aid of said Butler to secure the withdrawal of candidates from the ticket on which he was running, and in 1902, the said plaintiff also sought the aid and support of said Butler for the Public Ownership ticket, of which party plaintiff was leader, by proffering to the friends of said Butler five nominations to

the office of justice of the peace in the city of St. Louis.

"That in one of the campaigns in which plaintiff took part on behalf of said Public Ownership party, to-wit: in the campaign of 1897, said plaintiff on one occasion addressed a public gathering at Music Hall in the city of St. Louis, in the course of which address he made an impassioned appeal to the audience for contributions for the purpose of carrying on said campaign, and by preconcerted arrangement between plaintiff and others, of which arrangement a large majority of his audience knew nothing, various persons who had been supplied by the parties to said arrangement with money and valuables for that purpose, rushed forward to the stage from which plaintiff spoke and there threw down said money and valuables, or gave the same to plaintiff, in such manner as to induce and with the design of inducing other persons present to believe that said money and valuables were voluntarily and spontaneously contributed by the owners thereof, either upon the impulse of the moment, by way of response to the persuasive eloquence of plaintiff, or because of the devotion of said contributors to the cause which plaintiff advocated; and that by means of the spectacular devices and arrangement aforesaid, plaintiff and his associates designed and intended to induce and did induce other persons there present to contribute to said campaign fund.

"3. Answering further, defendant says that in the early part of the year 1901, plaintiff being then the nominee of said Public Ownership party for the office of mayor of the city of St. Louis, in order to further his said candidacy, advised and sought to procure one Albert Gebhart, who was then and there a candidate of the same party and on the same ticket with plaintiff for the office of marshal of said city, to withdraw from said ticket and to cease to be a candidate for said office of marshal, giving said Gebhart as reason for so with-

drawing, that his withdrawal would produce and would be worth $1,000 to plaintiff, and an equal amount to said Gebhart.

"4. Answering further, defendant says that in the year 1902 plaintiff was a delegate to the State convention of the Public Ownership party of Missouri held in the city of St. Louis on or about the thirty-first day of July, 1902, for the nomination of candidates for State and other offices and was also a delegate to a city convention of said party held in said city on the same day for the nomination of a city ticket of said party. That said State convention nominated candidates for the offices of railroad commissioner and State superintendent of schools only, referring the nomination of candidates for judge of the Supreme Court to an executive committee of which plaintiff was a member, with instructions to said committee to name as candidate of said Public Ownership party the three judicial nominees of the Republican party, upon condition that such action would not jeopardize the legal status of the Public Ownership party in future elections. That at said city convention nominations were made by said public Ownership party for some of the city offices to be elected in the city of St. Louis at the approaching election, leaving the nominations for other offices vacant and blank. That it was also recommended by said city convention that the executive committee of which plaintiff was a member should confer with representatives of other political parties and fill the vacant places on said Public Ownership party ticket with the names of persons nominated by other political parties, upon condition that said other political party should place on that ticket or tickets the persons nominated at said city convention by said Public Ownership party.

"That thereafter in conformity to the instructions and authority conferred upon the committee of which plaintiff was a member, a written agreement was made

and entered into and signed by and between plaintiff and other members of his said committee with one Charles E. Carroll and others representing the Republican party in said city of St. Louis, which agreement was as follows, to-wit:

" 'Messrs. Charles E. Carroll, John B. Owen and Charles F. Wenneker, having been appointed as a special conference committee representing the Republican City Central Committee, and Lee Meriwether, William A. Brandenburger and Frank S. Kowalski, having been appointed a special conference committee to represent the Executive and City Central Committees of the Public Ownership party, these two committees conferring together, have agreed as follows:

" 'The manner in which the election commissioner's office and the police force of St. Louis are used to stifle the will of the people, and the fact that an unfair, partisan election law is used to control elections regardless of the popular vote thereon, it is deemed both honorable and wise that all who believe in honest elections and freedom from police control of the same, should lay aside minor political differences and join in the task of securing a means for a fair counting of the peoples' votes. To this end we recommend that the Public Ownership party and the Republican party in St. Louis join forces during the present campaign for the purpose of defeating those who depend upon ballot box stuffing and police power for political success.

" 'To secure the ends mentioned in the above paragraph we recommend that the Republican party in the city of St. Louis make nominations for the following offices and no other: Three circuit judges; one judge Court of Criminal Correction; one clerk Court of Criminal Correction; one circuit clerk (criminal division); one assistant prosecuting attorney; one coroner; four justices of the peace; five constables; eight representatives and three senators, and we recommend that the

Public Ownership party shall make nominations for the following offices and no other: sheriff, recorder, license commissioner, probate judge, prosecuting attorney, circuit clerk (civil division), seven justices of the peace, six constables, eight representatives and one senator.

" 'Nominations having been made as provided in the above paragraph, we recommend that the Republican party fill the vacancies on its ticket with the nominees of the Public Ownership party and that the Public Ownership party fill the vacancies on its ticket with the nominees of the Republican party.

" 'After careful review of the election and police laws and of the entire situation in St. Louis with reference thereto, the two special Conference Committees have reached the conclusion that a combination of the two parties on the above basis is just, honorable and equitable as well as expedient, and the members of the two special Conference Committees herewith agree to use their efforts with their respective committees and parties to put in force the several articles of this memorandum, as hereinbefore set forth.

" 'It is mutually agreed between the two special Conference Committees, each of whose signatures is attached hereunder, that should it become at once expedient and honorable to make concessions to any other element or party in St. Louis that will join with the Public Ownership party and the Republican party on the issues above set forth, the Public Ownership party will agree to concede to said element or other party five justices of the peace and five constables.

" 'It is further mutually agreed and understood that in the event of the two parties carrying out the above plan of campaign, and in the further event that the tickets put forth in accordance with the above plan are elected next November, then and in that case all appointive officers shall be divided equally between the Republican and Public Ownership parties

where there is more than one such appointive office to be filled. Where there is only one appointive office to be filled, then in that case said office shall be filled by a member of the party electing the official making the appointment.

(Signed)   " 'CHARLES E. CARROLL,

      " 'JOHN B. OWEN,

      " 'CHARLES F. WENNEKER,

    " 'For Republican City Committee.

     " 'LEE MERIWETHER,

     " 'WILLIAM A. BRANDENBURGER,

     " 'FRANK S. KOWALSKI,

   " 'For Public Ownership Party.'

"That said agreement was contrary to public law, to public policy and to public morals, evil in itself and evil in its tendencies and was a huckstering of judicial and other public officers to whatsoever party or element would place the greatest number of votes at the disposal of the plaintiff and the same contemplated and provided for a degradation and prostitution of the functions of the offices to be filled at said election by stipulating that said functions should be exercised, not conscientiously by the persons elected, but in accordance with the aforesaid written agreement made by the said plaintiff with the said Carroll. And this defendant avers that it rightfully characterized the said plaintiff in view of his professions and his practices hereinbefore set out as a trickster in his public methods and as untruthful in his public statements.

"That plaintiff actively participated in, favored and worked for the combination and agreement so made between said Republican party and Public Ownership party, and thereafter as a member of the executive committee of said Public Ownership party endeavored to carry out said agreement. That during the pendency of the negotiations between the executive committee of the Public Ownership party and other political parties in

120 App.—24

the city of St. Louis as aforesaid, defendant was advised that plaintiff was holding frequent conferences with one Edward Butler, a citizen and prominent·politician of the city of St. Louis, and in view of the great public interest taken in the then pending campaign, and in order that defendant might publish a true statement of the then political situation and purposes of plaintiff's conferences with said Edward Butler, said defendant, through its correspondent and representative, one P. E. Burton, requested plaintiff to make a statement as to whether or not conferences had been or were being held between himself and the said Edward Butler, in reply to which inquiry and request plaintiff declared to said correspondent that he knew nothing about the matter, when and whereas in truth and in fact said plaintiff had but recently held two or three political conferences with said Butler, as plaintiff well knew.

"And thereafter, on the twenty-sixth day of September, 1902, plaintiff caused to be published in a daily newspaper of the city of St. Louis, to-wit: the Globe-Democrat, an interview admitting his conferences with Mr. Butler, in which published interview plaintiff charged this defendant with hypocrisy and duplicity, and in connection with the said interview also caused to be published in the said Globe-Democrat a letter written by plaintiff to this defendant on the twenty-fifth day of September, 1902, in which letter so published as aforesaid, plaintiff made the following statement of and concerning the Supreme Court of the State of Missouri:

" 'I informed Col. Butler that according to our view, the Democratic Supreme Court, in declaring the constitution itself unconstitutional, in order to nail up the ballot boxes, and thus cover all evidence of the frauds perpetrated at the last municipal election, had forfeited the right to claim support from any true Democrat.'

"5. And defendant further avers that in said cam-

paign of 1902, the said plaintiff contrary to his high-minded profession of a desire to elevate the methods of politics and public life, did dicker and barter with representatives of other political parties with a view to placing their candidates on the ticket of his party for a monied consideration to be paid to his party and did so dicker and barter with the State Committee of the Republican party respecting judicial offices and did in consideration of two thousand dollars paid to his party place the name of the Republican candidate for Congress in the Eleventh District upon the ticket of his party.

"6.  For further answer and defense defendant says that all and singular the matters and things herein alleged to have been done by plaintiff were at and prior to the time of the publication complained of currently and notoriously reported as having been done by him, and defendant was credibly informed and believed that they had been done, and for making the agreement hereinbefore set out, the said Carroll and others associated with him in behalf of the Republican party had been expelled by the State Committee of the said party from their functions as local committeemen and believing the said matters to be true, this defendant replying to the attacks made by plaintiff in letters and interviews in the public prints of the city, upon this defendant and upon the Supreme Court characterized the plaintiff as it believed him to be, a trickster in his methods and untruthful in his statements and it did so characterize him without malice or illwill but from a sense of duty and to place the plaintiff in a proper light before the people of St. Louis and the State of Missouri.

"And having fully answered, defendant prays to be hence discharged with its costs."

The reply was a general denial.

The article sued on was published September 17, 1902.  Plaintiff, over the objection of the defendant, in-

troduced and read in evidence a number of articles and editorials published by the defendant, concerning plaintiff and Butler, prior to the publication of the alleged libel. The following are excerpts taken from some of the articles and editorials:

"Ed Butler elected Zeigenhein by organizing the Meriwether campaign in 1897. That he acted in full partnership with the Zeigenhein machine, not a politician in St. Louis ever doubted."

"Nobody knows Ed Butler's political beliefs; it's descriptive of the man that the topic of beliefs has never been raised when he was under discussion; he was as thick with Zeigenhein as birds in the nest; he was Meriwether's manager and backer."

The following regarding Father Coffey's sermon and quoting from same, was published by defendant on February 23, 1902:

### "BOODLERS SCORED BY FATHER COFFEY.

*"Priest Delivers Maledictory Sermon on Political Bosses, Their Creed and Practices.*

#### "HE SCORES THE BRIBE GIVERS.

"Declared that they wear the Pharisee's garb on Sunday and play the role of Judas on Monday.

"The Reverend Father James Thomas Coffey delivered from the altar in St. John's church yesterday morning a sermon on political bosses and boodlers. No names were mentioned, but other marks of identification were furnished.

"Father Coffey vehemently denounced the philosophy made prominent in interviews with Col. Edward Butler, which were published last week. He characterized the politician's assertions as 'brazenly shameful and scandalous.'

"Father Coffey's theme was 'Sacramentals.' This subject relating to the blessing of candles and other

things that are used in religious ceremonials, led to a reference to superstitions and ultimately to a consideration of religious practices. He said that some persons performed obligations merely from habit, and profess to be believers, while at the same time they perform deeds from year to year that are in direct contrast to moral law. He illustrated his conference by dilating on the action of political bosses.

### "GREAT INFLUENCE OF MONEY IN POLITICAL AFFAIRS.

" 'A man wants money,' the priest said. Money is a good thing in itself. Is a man justified in getting money by dishonest and disreputable means? This whole community has been shocked and dumfounded at the assertions made in the public press during the last week by a certain political boss of very unsavory reputation.

" 'Men may do wrong. Politicians are men and may sometimes do great wrongs, but it is seldom that men will stand up before the bar of public opinion and tell the people that they have helped to rob them and now glory in their misdeeds. Is it possible that the tide of public morality has run so low, and the greed for the almighty dollar has grown so intense, that political highway robbers may boast of their rascality without even the fear of a reprimand from those whose duty it is to safeguard the State, society and the home? What a lesson for the young men of to-day who have any ambition to rise to positions of prominence and responsibility either in business or in politics.

" 'Be crooked — take bribes — rob the people — give away valuable franchises — buy legislators. While doing all this be sure that you burn the bridges behind you, and all is well. If corporations want valuable privileges from the city, get your fee — a big fat one if possible; and when the fee is safe in your pocket buy up the votes of the venal hord of city lawmakers and your work is complete.

" 'There is nothing wrong in this, so long as you are not caught. And if you are the right kind of a politician you will never be caught. This kind of a boss is evidently not in politics for his health, he is in it for boodle, and it makes no difference how he gets the boodle.

" 'If such a man dare call himself a Catholic I want to say that he is a deep-dyed traitor and consummate villain. He is a traitor to his church because he is a tratior to his God and to his country. He engineers the stealing of franchises and other public utilities for a money consideration. And it has come to this: that the boss can and will block any legislation that is intended for public utilities unless the fee is forthcoming. When a fee is denied, or when they anger the boss by trying to pare down the compensation, he threatens exposure, and generally succeeds in accomplishing what he threatens.

" 'If the Suburban fee had been paid promptly into a political boss' hands the awful scandal unearthed by Mr. Folk would have been buried in oblivion, like hundreds of others of a similar nature that have never been brought to light in our courts. Thank Heaven, the nefarious plot miscarried. Thank Heaven for such a man as Mr. Folk in such a crisis. Thank Heaven for the lesson this disclosure will teach our young men. Murder will out. So will villainy of every kind. You may hide it for a while, but there is a just God and he will raise up honest men, moral men, whose mighty courage like that of the boy David, will give them strength to slay the boasted Philistines of our modern political armies.

" 'The day has come in St. Louis when bosses who debauch our young men and organize them into bands of repeaters and murderers must not dare to boast of their misdeeds. The day has come when political parasites who have bled corporations and corrupted our mu-

nicipal legislative bodies must be driven from the management of political parties, if these parties would have the support of an honest and upright people.' "

Without objection the following article, published by defendant on February 1, 1902, was read in evidence:

### "JUSTICE CANNOT NEGLECT HIM.

"In these days of investigation of public men and public methods, when so many distinguished citizens are shrinking modestly into the background, one man comes to the fore and poses proudly in the full glare of the light of public scrutiny. This man is Edward Butler.

"What to Turner, Stock and Wainwright is an emergency, to him is an opportunity. While they are praying for the mountains to fall upon them and hide them, he posts his advertisement upon the mountain side in letters as large as he can write.

"Tweed in the height of his power was not so truculent. He asked: 'What are you going to do about it?' Butler goes further and tells the people what to do.

"To every man who wants a franchise or public privilege, he says, 'Come to me.' He not only guarantees results, but saves his client from all annoyances as to details. And, what is of even more importance, and will be so appreciated, he leaves no trace for impertinent investigation.

"From a business point of view the advertisements of Mr. Butler are certainly timely; so much so that he announces not bargains, but enhanced prices. He wishes it distinctly understood that he is not a 'cheap' man.

"While this is a great opportunity for Mr. Butler it is an equally great opportunity for the grand jury, which is to convene on Monday, and we recommend Mr. Butler to that body as an examplar in one respect at least, and that is that they be swift to seize the opportunity and utilize it to the utmost.

"Mr. Butler has with an amazing hardihood announced his readiness to violate the law. He has pleaded guilty to past violations of the criminal code, and he should not be denied an opportunity to plead to an indictment. His moral turpitude he has confessed, and there wants nothing but his conviction of a specific instance of crime.

" 'Let no guilty man escape,' and let not this guiltiest of all men herald his immunity and boast his villainy. He has said too much to be passed by unheeded. The slime will betray him where he has crawled.

"There is no expertness in crime that can forever baffle the persistent efforts of honest men, fearless of consequences, armed with the power of the law, and diligent to vindicate its offended majesty.

"For years this man has been a shame and a reproach to the community. For years he has stood as the perverter of the young, an example of proud, prosperous and pampered wickedness. He has sneered at all virtue as weakness and scoffed at all goodness as a false pretense. Let him be taught the shortcomings of evil, that it endureth not, but has an appointed course to run, and in the providence of God, sooner or later, overwhelms the doer of it.

"He has confessed to an attempt to commit the very offense which is now being probed. He had this very Suburban bill in charge and revenges himself now upon those who discharged him for being slow by reminding them that, while slow, he is sure.

"Let the grand jury indict him, and, bettering his instructions, teach him that Justice, too, while slow is sure; that while 'she has leaden feet which are slow to o'ertake a sinner, so hath she leaden hands which, when they strike, pay home.' "

The following, published May 24, 1902, was introduced in evidence, over the objection of the defendant:

## "HIS RACE IS RUN.

"No surprise will be felt over the report that Lee Meriwether has consulted the Republican leaders regarding the work of the next campaign. In the past he has been an ally of this party and would naturally make terms with their managers before determining his course for the future.

"The cheap demagogy which has characterized his political tactics during the past few years will not help him this year. It was to be expected that the greater part of his own personal following would denounce him. Expressions of the men in charge of the Allied Third party movement leave no doubt as to their feeling against their former fellow-worker.

"If Republican politicians wish their campaign to be contaminated by a trade with Meriwether they have the sympathy of self-respecting voters. The last ditch must be reached when an alliance with this political pretender is deemed necessary to success. The few manipulators who will lend themselves to carry out the deal will be welcome to any popular support which they may get.

"For substantial support will be lacking. The mere fact of an alliance between the Meriwether and Republican forces will be sufficient to draw the line between those who have ideas of political morality and those believing in expediency at the expense of uprightness in party matters.

"Meriwether has run his course. His back-door conference with politicians who are willing to traffic in his political virtue will produce no results. For every vote which he might bring to the Republican or any other ticket there would be losses on his account which would more than balance the small gains.

"His protestations of unselfish interest in the welfare of the public are tommyrot. The willingness with which he has attempted to play with the confidence of a

few supporters reveals the animus of the typical dem-
agogue. He has lost the respect which a sincere purpose
inspires, even among opponents. The voluntary deser-
tion of friends for a consideration, whether it be the
office of sheriff or the acceptance of money, is a political
bargain which cannot be realized upon. No explana-
tion which Meriwether can make, short of complete po-
litical reformation, can move him from the present un-
favorable position he occupies in the minds of the
people."

On July 23, 1902, the defendant published an article
severely criticising the methods of certain Republican
politicians, in the city of St. Louis, in which the follow-
ing paragraph appeared:

"Fooling the voters will not be easy. Kerens is too
well known to pass for a non-partisan reformer. The
machine may keep honest Republican speakers out of
sight and hearing, but they cannot hide the spoils-
hunting faces of the professionals who have run the Re-
publican party in Missouri for years and are running it
still.

"These professionals are notorious in their own
national party as the 'd—dest outfit' ever seen. If they
are the d—dest outfit when alone, who shall invent
damnatory language to describe them when associated
with Phelps, Meriwether and Cook? And how are they
going to conceal the character of the combination?"

This article was objected to. Other articles pub-
lished prior to September 17, 1902, accusing Meri-
wether of combining with Republicans and resorting to
political treachery to defeat the Democrats and to elect
Zeigenhein Mayor of St. Louis were read in evidence,
over the objection of the defendant.

To sustain the issues on its part, defendant read
in evidence the fusion agreement copied in paragraph
4 of the answer, and offered oral testimony tending
to show that the concession of naming five justices and
five constables was to be given to the Butler element;

that charges were preferred to the Republican State Central Committee against the members of the Republican City Committee, who signed the agreement, for having signed the same, and that the agreement was turned down by the Republican State Central Committee and the signers of the agreement removed from the Republican City Committee. Defendant showed that in the campaign of 1902, Charles F. Joy was the Republican nominee for Congress from the Eleventh Congressional District and as such paid plaintiff's party two thousand dollars for the purpose of having his (Joy's) name placed on the ticket of the Public Ownership party.

The evidence shows that in 1901, plaintiff was a candidate before the Democratic Convention for nomination to the office of mayor of the city of St. Louis, that the convention nominated Edward Harrison, and plaintiff became an independent candidate, and received contributions to his campaign fund from the Republican City Committee, and also from Edward Butler.

Defendant offered evidence tending to show that during the city campaign of 1897, and on March 27th, of that year, a public meeting in plaintiff's interest was held, at which one Vrooman presided; that Vrooman, with plaintiff's knowledge, had provided collection boxes and distributed money to persons initiated in the secret, with instructions to make a rush for the collection boxes at the opportune moment, and drop in the money furnished them, for the purpose of creating enthusiasm and to induce the uninitiated to contribute to plaintiff's campaign fund.

Albert Gebhart testified he was a candidate on the Public Ownership ticket in 1902; that on or about March 21, 1901, Meriwether tapped him on the shoulder and said, "Al, Mr. Butler has been to see me and offered me one thousand dollars for my influence to get you off the ticket. Mr. Butler wants your answer in the morning;" that he (witness) answered that Butler

couldn't get him off the ticket at any price, whereupon Meriwether said, "Well, of course, I would advise you to be discreet in this matter." Witness further testified that Butler afterwards came to see him and offered him one thousand dollars and a guarantee of the position of chief clerk in the marshal's office, if he would withdraw in favor of Scullin, an opposing candidate; that he declined the offer and made the matter public by affidavit, at the request of a newspaper reporter; and that he had gradually fallen away from plaintiff and no longer believed in him.

Defendant's evidence tends to show that in the campaign of 1902, Butler conferred with plaintiff, with a view of getting the names of the Democratic nominees for judges of the Supreme Court on the Public Ownership ticket; that Butler also conferred with Mr. Rothwell, Chairman Democratic State Central Committee, in regard to the same matter, and that his proposition to Mr. Rothwell was of such a character that the latter refused to consider it or discuss the same with Butler. Defendant also showed that in the campaign of 1902 the following offer was made to the Public Ownership party:

"We will pay $1,000 when the ticket is filed with the three Republican Supreme Court candidates and one Court of Appeals is filed with Secretary of State and accepted by him, and $1,500 additional by October 10th, and this will be guaranteed.

"AKIN,

"Chairman State Committee.

"STIEFEL,

"Chairman Finance Committee.

"And NATHAN FRANK."

In rebuttal plaintiff's evidence tends to show that the Butler element was not mentioned by him when the fusion agreement of 1902 was introduced, but that plaintiff at that time discussed fusion with the Allied Party and with the Socialist Party, and no one in the confer-

ence mentioned the Butler element except Carroll. In respect to the effort of Butler to have the Democratic nominees for judges of the Supreme Court placed on the Public Ownership ticket, plaintiff testified, in substance, that he told Butler, according to the views of the Public Ownership party, the Democratic Supreme Court, in deciding the Constitution unconstitutional, forfeited the right to claim support from any true Democrat. That he knew nothing about the trick contribution played at the meeting of March 27, 1897, and was only a speaker on that occasion and never heard of the trick until after the election; that he neither asked or accepted advice from Butler. In respect to the Gebhart-Butler incident, plaintiff testified he did not submit Butler's offer to Gebhart for the purpose of having it accepted, but in order that they might catch Butler in a trap and use it for campaign purposes; that the offer of the Republican State Committee to pay twenty-five hundred dollars to have the Republican nominees for the Supreme Court judges placed on the Public Ownership ticket was rejected.

In the Public Ownership committee's report of the funds received and disbursed in the city campaign of 1901, the $3,468.71 contributed by the Republican City Committee was entered "Contributed by people at mass meeting." The report of 1902 reported the two thousand dollars contributed by Joy in two items, one thousand as contributed by Joy and one thousand "contributions collected by Meriwether."

Plaintiff also testified that in the campaign in 1897, he criticised Zeigenhein as collector.

Plaintiff's mother, father, wife and little boy were present at Troy during the trial. On the last day of the trial, at the noon recess, plaintiff's little boy was playing in a sand pile near the courthouse yard. His father and mother were in the yard and entered into a conversation (not about the case) with one of the jurors. Plaintiff came along and his mother said to

him, "Lee, you can go over and play in the sand with your little boy until court is ready. The jurors have not gone in yet." Plaintiff replied, "I have other sand piles to play in than that." His mother said, "Do you reckon the jury will decide to-day?" Plaintiff checked her, saying, "Don't speak, this gentleman is a juror," and proceeded on his way to the courthouse. His mother testified that she did not know the gentleman, and had no idea that he was a juryman. Another witness and the juryman testified that Mrs. Meriwether said to the latter, "How do you think the case will go?" To which the juryman replied, "I am on the jury but justice will be done." The juror further testified that the conversation made no such impression upon his mind as to have anything to do with his verdict. This evidence was made the basis for a motion to discharge the jury and, after verdict, was offered in support of the motion for new trial.

The trial resulted in a verdict for plaintiff for five thousand dollars. Plaintiff entered a remittitur of five hundred dollars. After taking the usual steps, defendant appealed the case to the Supreme Court, from which court the case was transferred to this court.

BLAND, P. J. (after stating the facts).—1. One of the assignments of error is the admission in evidence of publications antedating the publishing of the article sued on. Evidence within the allegations of the petition was competent, whether it related to matters which transpired prior or subsequent to the transaction forming the foundation of the suit. It is alleged in the petition, substantially, that prior to the publication of the libel, the defendant had published in its newspaper, articles denunciatory of Edward Butler, holding him up to the public as a criminal, etc., and had persistently advertised Butler as the synonym of all that was vile, dishonest, corrupt and criminal, and then published the libel, in which plaintiff is alleged to be a co-worker with

Butler for all purposes of practical politics. Fairly construed, the petition states that defendant, by its publications, first blackened the personal and political character of Edward Butler and then, in the publication sued on, characterized the plaintiff as a co-worker with Butler and classed him as being on the same moral plane in political matters. If Butler had not been denounced and held up to public scorn by the defendant, to charge the plaintiff with working with him in politics would not be a libel; but if Butler's character is as bad as the petition alleged the defendant charged it to be by its publications, to be associated with him in political work, or otherwise, would be disgraceful, and the charge that plaintiff was associated with him in political work, would tend to blacken the character of plaintiff. For these reasons, we think the publications were within the allegations of the petition and were necessary evidence to make out plaintiff's case. The point is also made, that they were not admissible for another and further reason, that is, that there is no allegation in the petition that Butler was a corrupt man, or that he was believed to be so. It is not alleged that Butler was, in fact, corrupt, or generally believed to be corrupt, nor was there any evidence introduced in respect to his character. It is alleged that he was held up by the defendant's newspaper (shown by the evidence to have a daily circulation of over one hundred and fourteen thousand copies) to be a corrupt man, and in some of the articles published by defendant, was denounced as vile, dishonest, corrupt and criminal. It is a true saying, that public opinion, both as to men and measures, is largely moulded by the public press; and under the pleadings, it was not so much a question whether or not Butler was in fact a bad man, as whether it was, under the circumstances, libelous to charge plaintiff with being a co-worker of his in political matters; and we think it was a question for the jury to determine

whether or not the plaintiff was slandered by being published as an ally and co-worker with Butler in political matters.

2.    The court instructed the jury, that plaintiff's letter to the defendant, copied in the petition, which defendant refused to publish and which it denounced as false in the alleged libel, was in fact false so far as it related to the Supreme Court. Defendant invokes the maxim, *"Falsus in uno, falsus in omnibus,"* and contends that its instruction, in the nature of a demurrer to plaintiff's evidence (asked at the close of the case) should have been given. It seems that plaintiff's letter was provoked by the charge that he and Butler were conspiring and planning together to fix up fusion tickets. Butler had conferred with plaintiff with a view of getting the democratic candidates for judges of the Supreme Court on the ticket of the Public Ownership party, and the letter was written for the purpose of correcting a seemingly erroneous impression, communicated to the defendant in regard to this conference. What is said in the letter about the Supreme Court was an expression of an opinion concerning that court, entertained by the writer and his co-managers of the Public Ownership campaign, and given as a reason for objecting to placing the democratic candidates on the Public Ownership ticket. It was a statement intended to controvert or correct the notion that plaintiff and Butler were working together to fix up fusion tickets. It was an argument based upon false premises, resorted to, not for the purpose of making a direct charge or corruption against the Supreme Court, but for the purposes of dispelling the belief that plaintiff and Butler were working together for the purpose of defeating the democratic party. The unjust and false criticism of the Supreme Court was not the principal matter under discussion; it was but an incident, and was brought into the discussion for the purpose of refuting the charge,

that plaintiff and Butler were working together and with the common object, to defeat the Democratic party. The defendant was not only justified, but it was its duty to the public to denounce, as it did, the criticism as false, and the trial court very properly instructed the jury to the same effect. But it cannot be held, as a matter of law, that because the plaintiff entertained and expressed a false opinion in regard to the integrity of the Supreme Court, that his entire letter is a tissue of falsehoods, or that he was conspiring with Butler and the Republican press and politicians to defeat the Democratic party, as charged in the libel. *"Falsus in uno, falsus in omnibus,"* is but a legal maxim, not an inflexible rule of evidence; and in practice, its application is delegated to the jury under appropriate instructions; and we think the question, whether or not the letter or the libel spoke the truth in regard to the principal matters in controversy, was for the jury.

"The truth, when relied on in justification of libel or slander, must, to constitute a complete defense, be as broad as the defamatory accusation, and so the proof of the truth of a part only of a charge will not amount to a complete defense." [18 Am. and Eng. Ency. of Law, p. 1070.] Therefore, it was proper for the court to give the following instruction:

"4. The jury are instructed in this case the defendant pleads justification; that is, it declares the statements contained in the publication complained of are true of and concerning the plaintiff. Under this plea it is defendant's duty to prove the truth of the statements in the publicaton complained of in plaintiff's petition. And it is not sufficient for defendant to prove the truth of merely a portion of the statements contained in the publication complained of. Even though the defendant proved the truth of a portion of said publication, yet your verdict should be against the

120 App.—25

defendant's plea of justification if you find from the evidence that it has failed to prove any statement in the publication complained of, providing such statement is found by you from the evidence to be false and a libel upon plaintiff."

3. The court gave the following instruction on the measure of damages:

"5. The jury are instructed, if your verdict is for the plaintiff, you will assess his compensatory damages at such sum as, from the evidence and under the instructions, you believe will fairly compensate him for the injury, if any, he has sustained by reason of said publication, and in determining what is such fair compensation you may take into consideration the extent of said circulation of defendant's newspaper at the time of said publication, as shown by the evidence the general character of the publication and the probable effect, if any, of the said publication upon the reputation of the plaintiff, considering his standing and repute in the community at, or prior to September 27, 1902, as shown by the evidence; the mortification, if any, to his feelings which plaintiff may have suffered by reason of the publication, the distress of mind, if any, which he may have suffered on account thereof; and considering all these matters, you may assess the compensatory damages of the plaintiff at such sum as in your opinion will be a fair compensation to him for the injury, if any, you believe he has suffered from the publication of said article, such sum, however, not to exceed the amount sued for on the score of compensatory damages, to-wit, $5,000."

Substantially, the libel branded plaintiff as a liar, as a trickster and an ally of Butler. Defendant contends that the charges are distinct, and one or all may be true, and if one or more are true, defendant is not liable on them, and for this reason the instruction on the measure of damages, authorizing the jury to find

damages for the publication as a whole, though part of it might be true, is erroneous. We do not think this criticism of the instruction is just. Reading the above instructions together, it seems to us the jury could not have been so obtuse as not to see that the damges they were authorized to award were to compensate plaintiff for the injury caused by so much of the publication as they found to be both false and libelous. We think also, that if defendant thought it worth while to specially direct the jury in respect to this matter, and if it desired the benefit of the mitigating circumstances in evidence to reduce the damages, it should have requested appropriate instructions. It was not the duty of the court to give such instructions unless requested to do so. [Minter v. Bradstreet Co., 174 Mo. 444, 73 S. W. 668 (disapproving Callahan v. Ingram, 122 Mo. 355, 26 S. W. 1020, cited and relied on by defendant.)]

4. The jury were instructed in respect to exemplary damages and in respect to the form of their verdict as follows:

"If the jury find in favor of the plaintiff for actual damages only, the verdict may be in the following form, to-wit:

"We, the jury, find in favor of plaintiff for actual damages, and we assess the amount of his recovery at (here insert the amount agreed upon).

"If the jury find in favor of the plaintiff for actual damages, and also for punitive damages, the verdict may be in the following form, to-wit:

"We, the jury find in favor of the plaintiff for actual damages, and assess the amount of his recovery at (here insert the amount agreed upon).

"And we further find in favor of plaintiff for punitive damages, and we assess the amount of his recovery at (here insert the amount agreed upon)."

The verdict returned is as follows:

"We the jury find in favor of the plaintiff for actual damages, and we assess the amount of his recovery at $5,000.

(Signed)                    WILLIAM RINAMAN,
                                        "Foreman."

Under the above instruction there is no room to draw the conclusion that the jury may have included punitive damages in their verdict.

5. The defendant asked the following instruction:

"18. Contributions may properly be made by any person to a political campaign fund, but they should be made openly, that the public may know what are the various influences supporting a candidate; and if the jury find from the evidence that plaintiff, while a candidate for the office of mayor on a Public Ownership platform, and as representing the Public Ownership party, received financial contributions in aid of his campaign from Republicans who were supporting a candidate of their own party, and who were contributing to plaintiff's campaign fund, because they believed that his candidacy was in its effect detrimental to that of the Democratic nominee, and plaintiff did not publicly acknowledge such contributions and such relation with the Republicans, then the defendant had a right to characterize him as a trickster in politics."

The court struck out the words "characterize him as a trickster in politics," and inserted in lieu thereof the words, "criticise plaintiff therefor," and as thus modified gave the instruction.

In State v. Smith, 82 Minn. 342, trick is defined as a "sly, dexterous, ingenious procedure fitted to puzzle or amuse, and is synonymous with strategy, wile, fraud, cheat, deception or delusion." Webster defines trick, "to deceive by cunning or to impose on, to defraud, to cheat."

The evidence shows that after plaintiff was defeated for the nomination for mayor in the Democratic con-

vention of 1897, and became an independent candidate, the Republican city campaign committee contributed over three thousand dollars to his campaign fund. This contribution was reported by the treasurer of the Public Ownership party as having been "contributed by people at mass meeting." The report was misleading and intended to deceive, and hence the transaction may be said to come within the definition of a trick; but Meriwether did not make the report and we doubt if it would have been proper for the court to have declared, as a matter of law that it was a trick. The modification of the instruction justified criticism of the transaction but left the nature, extent and severity of the criticism to the judgment of the jury. Under the evidence and the instructions, the jury might very well have found that defendant was justified in characterizing the plaintiff as a trickster, and we see no substantial objection to the modification of the instruction, especially in view of the fact that the jury was the judge of both the law and evidence in the case.

6. Defendant asked the following instruction:

"13. If the jury find from the evidence that, at any time prior to the time of the publication complained of, the plaintiff had been associated with Edward Butler in the conduct of politics, and had accepted the aid and co-operation and financial support of the said Butler in the attainment of his political purposes, then the defendant had the right to criticise plaintiff as an ally and associate of the said Butler."

The court added the following proviso and gave the instruction as modified:

"Provided that they further believe from the evidence that the defendant, in good faith, believed that such association continued and existed at the time such criticism was made."

The libel charged a present alliance between plaintiff and Butler; for this reason, we thing the modification of the instruction was proper.

7. The court refused the following instructions asked by the defendant:

"11. You are instructed that the agreement made by Charles E. Carroll, John B. Owen and Charles F. Wenneker upon one side, and Lee Meriwether, William A. Brandenberger and Frank S. Kowalski upon the other side, is, by its terms, opposed to public policy and to public law, and corrupt in its tendencies, and it was the right and privilege of the defendant to comment upon it and upon all who had part in it in appropriate terms, and to criticise the agreement itself as corrupt, and the parties to it as employing improper methods in the conduct of politics.

"12. As the agreement between Charles E. Carroll and his associates on the one side, and Lee Meriwether and his associates on the other, was in itself a corrupt agreement, and inasmuch as that agreement provided for making concessions to other elements or parties in St. Louis who would join with the Public Ownership and Republican parties the defendant was warranted in believing, if it did so believe, that the Butler element, if an element so-called existed, was intended thereby, and defendant had the right to comment as it did upon the plaintiff in association with the said Butler, and was not guilty of publishing a libel in so doing."

Of its own motion, the court gave the following in lieu of the above refused instructions:

"If the jury believe from the evidence that the defendant in good faith regarded the agreement made by Charles E. Carroll, John B. Owen and Charles F. Wenneker, upon one side, and Lee Meriwether, William A. Brandenberger, and Frank S. Kowalski, upon the other side, as opposed to public policy, to public law, and to be corrupt in its tendencies, then it was the right and privilege of defendant to comment upon such agreement, and upon all who had part in it, in appropriate terms, and to criticise the agreement itself as corrupt, and the

parties to it as employing improper methods in the conduct of politics.

"12.   If the jury believe from the evidence that the defendant, in good faith, regarded the agreement made by Charles E. Carroll, John B. Owen and Charles F. Wenneker, upon one side, and Lee Meriwether, William A. Brandenberger and Frank S. Kowalski, upon the other side, as opposed to public policy and as corrupt, and insomuch as that agreement provided for making concessions to other elements or parties in St. Louis, who would join with the Public Ownership and Republican parties, that the defendant believed, and was warranted in believing, that the Butler element (if any element so-called existed) was intended thereby, then the defendant had a right to comment upon such agreement and upon plaintiff as being in association with said Butler element."

Fusion of minority parties, for the purpose of defeating a dominant party, is common practice in this country, is not immoral in itself, or opposed to public policy, and is, under some circumstances, commendable. The chief complaint made by plaintiff in his petition and on his argument, is that the defendant yoked him up with Butler to do political work.   The republicans, who were parties to the Carroll-Meriwether fusion agreement, testified that the five justices of the peace and five constables, to be named by some other party, were to be named by the Butler element.   If this was the understanding, then plaintiff agreed to be yoked up with Butler in political work, and from his own standpoint, the agreement was corrupt.   But he testifies that no one in the conference mentioned the Butler element, except Carroll, and that fusion with the Socialist and Allied parties was discussed by him; that he had these parties in mind and not the Butler element. There is no evidence tending to show that fusion with the Socialist and Allied parties, or both, would have

been necessarily corrupt, under the circumstances, and we think, under all the evidence, it was for the jury to determine whether or not the agreement was in fact corrupt. The court's instructions fairly submitted this issue to the jury.

8. Defendant complains that plaintiff's fourth instruction supra, is too narrow, and does not fully submit the issue of justification. The instruction authorized a verdict for the plaintiff, if the jury found any portion of the publication to be both untrue and libelous. In a publication, if a number of truths should be stated about a named individual, which would be libelous if untrue, and in the same article a false and slanderous statement about the person should appear, we cannot see upon what ground he could be denied the right to recover on account of the publication of the false and slanderous matter. The false matter would be none the less libelous for having appeared in the same article with the truthful statements. The virus of the falsehood would not be extracted by being associated with truth. A falsehood may be concealed by a veneering of truth, but when uncovered it is more hideous than if its face had never been hidden. And it seems to us, that if any part of the publication is libelous and untrue, plaintiff was entitled to recover; if not then a publisher of a newspaper may publish a libel of whom he will and escape liability by appending a modicum of truth to the article.

9. Defendant contends the damages are excessive. The assessment of damages in this character of cases is peculiarly within the discretion of the jury, and courts will not interfere with their award, unless the amount is so excessive as to satisfy the court that the jury was influenced by passion or prejudice. The sum assessed by the jury does not appear to us to be so excessive as to indicate that the jury were influenced by either passion or prejudice.

10.  The evidence and affidavits in support of the charge that plaintiff's mother and father tampered with one of the jurors, it seems to us, falls far short of establishing the charge.  The conversation between them and the juror was casually introduced by the plaintiff's mother, in total ignorance at the time the person she was talking to was a juror.  What was said was not calculated to influence the juryman in the least.  He swore he was not influenced in making up his verdict, by anything that was said, and we cannot believe that he was.

No reversible error appearing, the judgment is affirmed.  All concur.